UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>RICHARD ALLEN,<br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 18-cr-26-JJM-PAS

## MEMORANDUM & ORDER

JOHN J. McCONNELL, JR, Chief United States District Court Judge

To decide this Motion to Suppress, the Court must decide whether government agents had the Defendant in custody when they questioned him at the airport after his international flight, and whether, under *Missouri v. Seibert*, 542 U.S. 600 (2004), the agents employed a deliberate practice of obtaining pre-*Miranda* admissions as a ploy for seeking admissible incriminating evidence post-*Miranda*.

## I.   FACTS

Richard Allen, a former active-duty member of the United States Navy, was a suspect in an ongoing investigation by the United States Naval Criminal Investigative Service and the Department of Homeland Security ("Homeland Security"). They suspected him of breaking into United States Navy installations, stealing military items, and selling them for profit to buyers overseas, specifically in China. ECF No. 54 at 14; ECF No. 53 at 28.

Homeland Security tried to "locate Mr. Allen and noticed that he was frequently out of the country." ECF No. 54 at 8. After they arrested his co-

defendant, Matthew T. Deleo,[1] Homeland Security "had a subject record placed into [the] system in order to notify [them] when Mr. Allen would be back in the country." *Id.*

A few days before Mr. Allen's scheduled return from overseas, Homeland Security received a notification that he would be returning to the United States at Atlanta's Hartsfield International Airport from Punta Cana, Dominican Republic. *Id.* at 9. Two Homeland Security agents, Ryan Chaffee and Brian Goldsworthy, flew from Boston to Atlanta to interview him. ECF No. 53 at 64. They had "hope[d] [ ] that he would speak to [them] about . . . a criminal enterprise." ECF No. 54 at 33. They wanted to be present when Customs and Border Protection ("CBP") conducted a secondary inspection of him and his luggage after he arrived back in the United States. ECF No. 53 at 8. When asked why they decided to conduct their confrontation and questioning of Mr. Allen in this way, Agent Chafee said:

> [W]e're customs officers, so we're comfortable encountering people at the airport. He had been out of the country more days in 2015 than he had been in the country. We believed he was a flight risk from discussions that were had with the initial confidential informant.

ECF No. 54 at 11.

On December 17, 2015, at about 5:40 p.m., CBP officers, after a determination of citizenship, referred Mr. Allen to a secondary area on a different level in Terminal F and separated him from his baggage. ECF No. 53 at 22.

---

[1] Mr. Deleo pleaded guilty to export enforcement violation conspiracy, conspiracy to commit an offense against the United States of America, and theft of government property and aiding and abetting. *See United States v. Deleo*, C.A. No. 17-cr-23-JJM-LDA.

Passengers must go to the secondary inspection area if agents instruct them to do

so.  ECF No. 54 at 17–18.  The CBP officers then began their inspection of Mr.

Allen's baggage, asking him routine secondary inspection questions.  Agents

Chaffee and Goldsworthy looked on.

> [W]e're also looking to conduct a secondary inspection . . . based off of
> the investigation that there's a chance that we would find evidence of .
> . . merchandise that was illegally crossing the border.
> *****
> I think we kind of stood by and let the CBP officers do their job . . .
> conducting general questions of Mr. Allen and going through his
> baggage.
> *****
> It wasn't an extreme length of time by any means because we did end
> up introducing ourselves to him during that time.

*Id.* at 13–14, 21.

After introducing themselves to Mr. Allen, and showing him their badges,

Agents Chaffee and Goldsworthy decided that because there was "a lot of traffic"

and it was" very loud," they would question Mr. Allen at a private location nearby.

*Id.* at 22; ECF No. 53 at 72.  They "asked for him to come and speak with [them] in

a more private, quiet location."  ECF No. 54 at 22.

> Q. When you [Agent Goldsworthy] asked if he [Mr. Allen] would speak
> with you, did he respond to that?
>
> A. Yes, he did.  He agreed.  He said, Sure.

ECF No. 53 at 19.

They went through a door (that had a keypad lock on it) right next to the

baggage inspection area, down a hall, and into the first interview room on the right.

ECF No. 54 at 22.  The agents did not handcuff Mr. Allen.  ECF No. 53 at 20.  The

agents were in plain clothes. *Id.* at 18. They were armed, but their firearms were concealed the entire time. *Id.* at 60. The room was about twelve feet by twelve feet, with a table and chairs, and a telephone ("just a small room with a table"). *Id.* at 20. They closed the door to the room (ECF No. 54 at 23), but "it was opened and closed several times because [the investigators] were coming and going." ECF No. 53 at 21.

At around 5:55 p.m., Agents Chaffee and Goldsworthy both began to question Mr. Allen, first about his trip, and then about Matthew Deleo. *Id.* at 22. "Mr. Allen was completely cooperative and helpful during the questioning." *Id.* at 23. The agents considered themselves to be part of that secondary inspection and "at that point, Mr. Allen was not free to leave." ECF No. 54 at 48. The agents asked Mr. Allen about his electronic devices, his passwords, and his computer. ECF No. 53 at 21.

At some point at the beginning of the questioning, Mr. Allen indicated he knew Mr. Deleo. They asked Mr. Allen if he knew Mr. Deleo had been arrested and Mr. Allen said he had not spoken to him in a couple of months. ECF No. 54 at 25; ECF No. 53 at 23. The agents asked Mr. Alen if he was aware of Mr. Deleo's criminal activity. ECF No. 53 at 27. Mr. Allen began to make statements that the investigators perceived to be incriminatory.[2] ECF 54 at 25, 33. He made these

---

[2] The potentially incriminating statements made by Mr. Allen during the three-hour interview (ECF No. 54 at 52) included: that he was aware of Mr. Deleo's criminal activity, and that Mr. Deleo owed him $20,000 - $40,000 for finding customers in China who would buy the stolen uniforms; that Mr. Deleo stole the equipment to feed a gambling problem, and that Mr. Allen did it just for the money;

initial incriminating statements before the agents told him he was free to leave and before the agents gave him his *Miranda* rights. *Id.* at 48–49.

Agent Chafee then informed Mr. Allen that he was "free to leave," could "walk out that door," and was not under arrest. ECF No. 53 at 30. Mr. Allen responded that "he wanted to continue to talk." *Id.* at 30. The agents then continued the questioning, but they did not "have him go back and repeat what he said before." ECF No. 54 at 34.

Later in the questioning, the agents again told Mr. Allen that he was free to leave and that he did not have to speak to them any further if he did not want to. ECF No. 53 at 31. He said he understood. *Id.* at 31–32.

At 6:30 p.m., Agent Goldsworthy read Mr. Allen his *Miranda* rights. *Id.* at 32, 33. At 6:55 p.m., the agents again reminded Mr. Allen that he was not under arrest and was free to stop answering questions at any time. *Id.* at 36. The agents provided him a copy of a form with the *Miranda* rights on it. *Id.* at 36–37. After the agents crossed out the line on the form stating "I [the signatory] was taken into custody," Mr. Allen signed the rights' form. ECF No. 44-2.

Before the agents ended their questioning, Mr. Allen signed a statement detailing his involvement in the scheme to steal and sell stolen government

---

that there were sales of uniforms on eBay – with Mr. Allen revealing the eBay username that he and Mr. Deleo would use to sell stolen uniforms; that Navy Seal uniforms were worth more money than regular uniforms, and that he stopped selling the uniforms the year before; that he had directly participated in the uniform thefts, and that he acted as the lookout; and that he had made about $150,000 from stolen Navy merchandise, and that he no longer had access to any more equipment. *See* ECF No. 44-1.

property. *Id.* at 2–3; ECF No. 53 at 43. The interaction between the parties ended a little after 8:45 p.m. ECF No. 53 at 59. During the three-hour interview, Mr. Allen did not ask for, nor was he provided, any food or drink. *Id.* at 51.

When the interview ended, Mr. Allen got his bags and the agents escorted him out of the room and brought him to the transfer desk for his airline to reschedule his connecting flight home to California. *Id.* at 50. CBP held his passport during the interview, and they did not return it to him. *Id.* at 68. Mr. Allen could not fly home to California until the next morning. *Id.* at 95.

## II.   PROCEDURE

A grand jury indicted Mr. Allen on seven counts of conspiracy and money laundering. ECF No. 3. Mr. Allen filed a Motion to Suppress the statements he made at the Atlanta airport to Homeland Security agents, claiming violations of his Fourth and Fifth Amendment rights. ECF No. 44.

In his Motion, Mr. Allen asserts that he was in custody when Homeland Security questioned him, and that the questioning was an interrogation. *Id.* at 5. Because he was in custody when the agents interrogated him, he contends that the federal agents needed to inform him of his *Miranda* rights, and failure to do so mandates application of the exclusionary rule. He asserts that the failure to give timely *Miranda* warnings resulted in the agents violating his Fifth Amendment rights against self-incrimination. He also claims that the agents obtained the incriminating evidence in violation of his Fourth Amendment rights.

The Government objected to the Motion, claiming that Mr. Allen was not in custody when the agents questioned him, and even if he were in custody, the agents

6

reaffirmed his right to leave at any time and read him his *Miranda* rights as soon as he made any incriminating statements.  ECF No. 49-1.

The Court held an evidentiary hearing where it received the testimony of two Homeland Security agents – Brian Goldsworthy (ECF No. 53) and Ryan Chaffee (ECF No. 54).  The parties filed post-hearing briefs.  ECF Nos. 56 and 58.  The Court held another argument on the Motion.  This issue is now ripe for decision.

## III.   ANALYSIS

Mr. Allen contends that all incriminating statements and evidence collected by Homeland Security and CBP during his questioning at the airport were secured in violation of his constitutional rights, and therefore must be suppressed.

### A. Mr. Allen's Questioning Did Not Constitute an Unreasonable Search and Seizure

Mr. Allen argues that his questioning at the airport was an unreasonable seizure, in violation of his Fourth Amendment rights.  He claims that he "was detained and seized when he was told he had to go to the Customs and Border Protection area.  This was accomplished without a warrant or other constitutionally sound basis for his seizure."  ECF No. 44 at 7.  Given this, he urges this Court to suppress the statements made during the encounter, as "fruit of the poisonous tree" – evidence obtained through an illegal search.  *Id.*  The Government counters that Mr. Allen's seizure was reasonable under the border exception of the Fourth Amendment.  ECF No. 49-1 at 17.  Here, the Government is correct.

The Fourth Amendment's protections against unreasonable searches and seizures are subject to a well-recognized exception at the "functional equivalents" of the nation's borders, such as the airport where Mr. Allen was questioned. Under this exception, "'the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior' due to the 'longstanding concern for the protection of the integrity of the border.'" *United States v. Molina-Gomez*, 781 F.3d 13, 18 (1st Cir. 2015) (quoting *United States v. Montoya de Hernández*, 473 U.S. 531, 538 (1985)).

"Under the border search exception, routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant. These searches are reasonable simply by virtue of the fact they occur at the border. Non-routine searches, by contrast, require reasonable suspicion." *Id.* at 19 (internal citations and quotation marks omitted). "[W]hether a search qualifies as 'routine' or 'not routine' often depends on the 'degree of invasiveness or intrusiveness associated with' the search." *Id.* (citing *United States v. Braks*, 842 F.2d 509, 511–12 (1st Cir. 1988) (listing several factors to consider)).

Without analyzing its intrusiveness, Mr. Allen contends that his questioning at the airport was non-routine, and rather "a mechanism to force [him] into an environment where he could be questioned by Homeland Security special agents." ECF No. 44 at 7. However, even assuming *arguendo* that the encounter was non-routine, Mr. Allen's argument still fails.

"Reasonable suspicion exists when agents demonstrate some objective, articulable facts that justify the intrusion as to the particular person and place searched." *Molina-Gomez*, 781 F.3d at 20 (internal quotation marks omitted). As Agents Chafee and Goldsworthy testified during the evidentiary hearing, by this point Mr. Allen was the subject of an ongoing criminal investigation into the suspected theft and sale of United States military property. To this end, Agent Chaffee testified that "[i]t was within our due diligence to encounter someone we believe is involved in cross-border crime to encounter them at the border." ECF No. 54 at 12. The agents articulated several fears sufficient for justifying their search and questioning at the airport, including concerns about Mr. Allen potentially fleeing the country to avoid prosecution or destroying evidence and coordinating with other co-conspirators. They also expressed beliefs that Mr. Allen may have had evidence of his alleged crimes with him, including uniforms that he could not sell, or documents and receipts recording the illegal transactions. *Id.*; ECF No. 53 at 110.

Given the agents' reasonable suspicion of Mr. Allen, this Court finds that the Government did not violate his Fourth Amendment rights during his encounter at the airport. *Alasaad v. Mayorkas*, 988 F.3d 8, 20 (1st Cir. 2021) ("[T]he border search exception is not limited to searches for contraband itself rather than evidence of contraband or a border-related crime. Searching for evidence is vital to achieving the border search exception's purposes of controlling who and what may enter the country.") (internal quotation marks omitted). Screenshots obtained

through the search of Mr. Allen's phone comport with the agents' authority under the border search exception. *Id.* at 18 ("[N]either a warrant nor probable cause is required for a border search of electronic devices."). Therefore, the Court DENIES Mr. Allen's Motion to Suppress the images.

### B. Mr. Allen's Statements Must Be Suppressed Due to Violations of His Fifth Amendment Rights

Mr. Allen also moves to suppress his statements based on alleged violations of his Fifth Amendment rights. He argues that the statements were impermissibly obtained, given the agents' failure to communicate *Miranda* warnings before subjecting him to what he describes as a custodial interrogation. ECF No. 44 at 5. He moves to suppress the incriminating statements he made after the agents delivered his *Miranda* warnings, arguing that they were tainted by the agents' use of a "deliberate two-step strategy" to secure an inadmissible confession to use as leverage in post-*Miranda* questioning. *Id.* at 5–6. The Government counters that Mr. Allen was not subject to custodial interrogation before receiving *Miranda* and, even if he were, the incriminating statements made post-Miranda were entirely voluntary and not obtained through any impermissible two-step interrogation. ECF No. 49-1 at 9–17.

### 1. Mr. Allen Faced Custodial Interrogation Pre-*Miranda*

"The point of *Miranda* [i]s to preserve the suspect's Fifth Amendment privilege against compelled self-incrimination, be it by confession or admission, during 'custodial interrogation.'" *United States v. Rogers*, 659 F.3d 74, 77 (1st Cir.

2011) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).  Therefore, *Miranda* warnings, conveying to a defendant that they have rights to silence and counsel, are required when an individual is both in custody and undergoing an interrogation. *Molina-Gomez*, 781 F.3d at 22.  Here, the parties disagree on whether Mr. Allen was in custody.[3]

To resolve the disagreement, this Court must look to the totality of circumstances to decide whether there was a "restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Fernandez-Ventura*, 132 F.3d 844, 846 (1st Cir. 1998).  The First Circuit has held that "[t]hough custody is a somewhat amorphous concept, relevant considerations in a custody determination include, but are not limited to, whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *Molina-Gómez*, 781 F.3d at 22 (internal quotation marks omitted).  Both parties point to these factors, and others, to argue for and against finding that Mr. Allen was in custody during the questioning.

---

[3] While the parties disagree on whether Mr. Allen's questioning immediately constituted interrogation, the Government concedes that, pre-*Miranda*, the interview turned "to the sort of questions that would qualify as interrogation were Allen in custody." ECF No. 49-1 at 10.  Indeed, the agents' express questioning that led to Mr. Allen's inculpatory statements could clearly be considered an interrogation. *See, e.g., United States v. Ventura*, 85 F.3d 708, 711–12 (1st Cir. 1996) ("Here, quite clearly, if defendants were in custody, the officers' express questions constituted interrogation.").

This Court is persuaded by Mr. Allen's argument that he was in custody while being questioned by Agents Goldsworthy and Chaffee. After disembarking from an international flight, before connecting with another flight home, Government agents searched his baggage and electronic media and detained his passport. He was then ordered to go to secondary screening. ECF No. 54 at 17–18 ("Q. Is a passenger obligated to go to that secondary inspection if they're notified? A. Yes."). Simultaneously, other Government agents questioned him in a small room with the door mostly closed. The Government is correct that "events that 'might be enough to signal 'custody' away from the border will not be enough to establish 'custody' in the context of entry into [t]he country.'" ECF No. 49-1 at 10 (quoting *Molina-Gomez*, 781 F.3d at 22). Still, questioning in such an unfamiliar and charged environment might easily lead a reasonable person in Mr. Allen's position to understand his situation as one of being arrested. *See Stansbury v. California*, 511 U.S. 318, 323–24 (1994) (per curiam).

Mr. Allen's interrogation went for nearly 3 hours, the first 35 minutes of which proceeded without him being read his *Miranda* rights. That he was told he was free to leave by Agents Goldsworthy and Chaffee during the interrogation provides compelling support for the Government's position. However, these disclaimers came after the interrogation had begun, following a period of secondary inspection during which the Government concedes Mr. Allen was in fact not free to leave.

This blurring of Mr. Allen's secondary inspection by CBP and interrogation by Homeland Security proves detrimental to the Government's case.   While choosing to interrogate Mr. Allen at the airport helped the agents in their investigation of him, it also helped create circumstances that would lead a reasonable person to feel that they were not free to leave – in part because, at least at first, they were not.   Later disclaimers might lessen this impression, but do not necessarily overcome the initial harm of being interrogated in custody without having been read *Miranda*, particularly after the Defendant has already begun to incriminate himself.   *See, e.g.*, *Locke v. Cattell*, 476 F.3d 46, 54 (1st Cir. 2007) ("We believe it likely that a reasonable person would not have felt that he was at liberty to terminate the interrogation and leave after confessing to a violent crime and learning that a co-defendant has implicated him.").

Given the totality of the circumstances – being ordered to go to secondary by armed officers showing their badges, then lead down a locked corridor into a small room with a closed door to face organized questioning from the officers – the Court concludes based on the evidence presented that Homeland Security subjected Mr. Allen to a custodial interrogation.

      2.  <u>Agents Impermissibly Employed a Two-Step Strategy in Violation of *Siebert*</u>

Finding that Mr. Allen had experienced custodial interrogation and had begun to incriminate himself prior to being read his *Miranda* rights, this Court must now decide whether the agents' later warnings sufficiently overcame this

initial taint.  In support of their respective sides, both parties point to *Missouri v. Siebert*, which "makes vulnerable some post-*Miranda* statements if they were induced by pre-*Miranda* statements that should themselves not have been taken without a warning." *United States v. Widi*, 684 F.3d 216, 221 (1st Cir. 2012).

In *Siebert*, the police employed a deliberate strategy of eliciting a confession first without delivering a *Miranda* warning, delivering the warning, and then re-eliciting the confession by using the prior inadmissible confession as a lever. Finding the practice unconstitutional, a plurality of the Court held that "a series of relevant facts . . . bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Missouri v. Seibert*, 542 U.S. 600, 615 (2004).

Justice Kennedy, supplying the fifth vote for the judgment in *Siebert*, established a narrower test.  Under his approach, the deliberate use of a two-step interrogation creates a presumptive taint. *Id.* at 622 (Kennedy, J., concurring).  In such cases, he held, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id.*  Sufficiently curative measures would "allow[ ] the accused to distinguish the two contexts and appreciate that the

14

interrogation has taken a new turn." *Id.* Examples include a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning, or an added warning explaining the likely inadmissibility of the prewarning statement. *Id.*

The First Circuit has noted that "how to read the split decision in *Seibert* may be an open question," and has declined to settle on which test definitively controls its application. *Widi*, 684 F.3d at 221. However, under either standard,[4] while perhaps a close call, the agents' practices here fail to pass constitutional muster.

A review of the record evinces a deliberate two-step interrogation creating a presumptive taint over Mr. Allen's postwarning statements. This case presents a situation in which, in coordination with several different federal law enforcement entities,[5] two federal agents flew down from Boston to Atlanta to intercept Mr. Allen in between his connecting flights.[6] They flew down there to ask him questions about his potential involvement in criminal activity, for which his alleged co-

---

[4] The difficulty in figuring out law enforcement's intentions underscores the reasoning of the *Siebert* plurality test, under which "the focus is on facts apart from [law enforcements' deliberate] intent" and rather on those "that show the question-first tactic at work." *Siebert*, 542 U.S. at 616 n.6.

[5] ECF No. 53 at 82 ("[T]he Defense Criminal Investigative Service or DCIS . . . they played a role in this investigation in addition to NCIS."); 94 ("Before he became cooperative, there was some sort of coordination between the agencies in California and Homeland Security[.]").

[6] *Id.* at 75 ("Q. Two agents from Boston flew down to Atlanta to interview a person. That's not a typical event . . . is it? A. Correct, not . . . as far as traveling goes.")

15

conspirator had been arrested days earlier.[7]   They hoped to participate in his secondary inspection at the airport, which they soon pivoted to direct questioning about his relationship with his alleged co-conspirator.[8]   Once he began to incriminate himself, they delivered his warnings and proceeded down that same line of questioning, during which he incriminated himself further.[9]   And, despite reading his rights, they did so without taking any curative measures such as taking a break between the two lines of questioning or highlighting the likely inadmissibility of his prewarning admissions.

This Court appreciates the nuances and ambiguities in border interactions such as this. However, the Government's ability to deliberately capitalize on the unique constitutional realities at the border also harms its case. While our courts have cabined the Fourth Amendment in the border context, Mr. Allen's Fifth Amendment right to avoid self-incrimination remained as robust there as anywhere else. So, as the agents' questions turned to his potential criminal involvement, they should have made him fully aware of his rights. That they read him his rights after

---

[7] *Id.* at 74 ("Q. And you weren't interviewing Mr. Allen as a witness. You were interviewing him as a potential target; right? A. That could go either way, I think. You know, we certainly wanted to talk to him about Mr. Deleo, ask him questions about Mr. Deleo, yes."); 119 ("This is on December 17th, two days after Mr. Deleo was arrested; is that correct? A. Yes, that is correct.").

[8] *Id.* at 22–23 ("I recall inquiring of him the basic, you know, questions, what was the purpose of your trip, how long were you gone, you know, why did you go, what did you bring back, those types of questions, how was the trip. And then it became questions about -- asking him eventually about Matthew Deleo and his relationship with him.").

[9] *Id.* at 36 ("[Y]ou know, he was making some of these admissions. You know, we were concerned that -- we wanted to be sure that he really understood that he was not in our custody and what his, you know -- almost to protect us at this point.").

16

his initial inculpatory statements provides little comfort, given that his prewarning statements amounted to confessions to the crimes that he spent the rest of the questioning elaborating upon. *See Siebert*, 542 U.S. at 617 n.8 ("Because we find that the warnings were inadequate, there is no need to assess the actual voluntariness of the statement.").

Thus, the Court GRANTS Mr. Allen's Motion to Suppress all oral and written statements during his interrogation by Agents Goldsworthy and Chaffee.

## IV. CONCLUSION

The Court DENIES IN PART AND GRANTS IN PART Mr. Allen's Motion to Suppress. ECF No. 44. Because of the border exception, the agents did not violate Mr. Allen's Fourth Amendment rights. The Court thus DENIES his Motion to Suppress the screenshots obtained by agents during a search of his phone. However, this Court finds that he was in custody during his interrogation by Agents Goldsworthy and Chaffee, and the failure to initially read him *Miranda* violated his Fifth Amendment rights. The Court thus GRANTS his Motion with respect to all oral and written statements made during the interrogation.

IT IS SO ORDERED.

John J. McConnell, Jr.
Chief Judge
United States District Court

August 5, 2021